**In The**

*Court of Appeals*

*Ninth District of Texas at Beaumont*

_____

**NO. 09-22-00031-CV**

_____

**IN THE INTEREST OF B.P. and T.P.**

**On Appeal from the County Court at Law No. 3**
**Montgomery County, Texas**
**Trial Cause No. 20-04-05031-CV**

**MEMORANDUM OPINION**

V.P. ("Mother") and J.P. ("Father") appeal the trial court's order terminating their parental rights to their minor children, B.P. and T.P., based on Texas Family Code subsections 161.001(b)(1)(D), (E), and (O) and a finding that termination was in the children's best interest.[1] *See* Tex. Fam. Code Ann. § 161.001(b)(1)(D), (E), (O), (2). In five issues, Mother challenges the legal and factual sufficiency of the evidence supporting the predicate grounds for termination and that termination of

_____

[1]In parental rights termination cases, to protect the identity of the minors, we refer to the children by a pseudonym or initials and family members by their relationships to the children. *See* Tex. R. App. P. 9.8(b)(2).

her parental rights was in the children's best interest. In one issue, Father challenges the legal and factual sufficiency of the evidence supporting the trial court's best interest finding. We will affirm the trial court's judgment.

**Procedural Background: Allegations Leading to Removal**

In April 2020, the Department of Family and Protective Services ("Department") filed its Original Petition for Protection of a Child, for Conservatorship, and for Termination in Suit Affecting the Parent-Child Relationship naming C.P., one of B.P. and T.P.'s older siblings, as the subject of the suit. The Petition was supported by an affidavit of a Child Protective Services (CPS) worker. The Department averred that an altercation occurred between C.P. and Mother where C.P. threatened Mother with a pickax, and police arrested C.P. for making a terroristic threat.

Then, in October 2020, the Department filed its Original Petition for Protection of a Child, for Conservatorship, and for Termination in Suit Affecting the Parent-Child Relationship naming B.P., T.P. and J.L., another older sibling, as the subjects of the suit. The Department also supported this petition with the caseworker's affidavit. The intake allegations in the affidavit included that J.L. sexually abused T.P., and Mother reported she could not stop the abuse but has tried to separate them. The affidavit indicated the caseworker spoke with J.L., who denied sexually abusing T.P. on this occasion, but admitted doing so in the past and told the

caseworker she was "experimenting" because an older sibling had done it to her. The affidavit further stated that a few days later, CPS received a police report that T.P. ran away when confronted about sexually abusing B.P.; Mother told the caseworker that T.P. had been sexually abusing B.P. for the past month and detailed the abuse. According to the affidavit, when asked why she waited a month to report the abuse, Mother claimed she made a CPS report, but this was not verified in the CPS system. The affidavit noted that CPS received another police report stating that J.L. had sexually abused T.P. The affidavit outlined an extensive CPS history for both parents over more than a decade, noting parents' drug history and that Mother and B.P. tested positive at B.P.'s birth for cocaine and marijuana.

In October 2020, the trial court appointed the Department as temporary managing conservator of J.L., B.P., and T.P. and consolidated the cases involving the four siblings.[2]

### Trial Evidence

<u>C.P.'s Testimony</u>

C.P. testified that she was fourteen and wanted to return to her parents' home. She confirmed she went home in January, but she returned to the Department's care.

---

[2]The trial court ultimately severed C.P.'s case. J.L. aged out of the system without the Department proceeding to trial, and the trial court noted on the record her case was dismissed. *See* Tex. Fam. Code Ann. § 263.401(a), (c) (noting automatic dismissal of suit without an order if trial on the merits is not commenced within requisite time).

3

C.P. explained that she has matured, communicates better with her parents, and did not believe she would be in danger, even though J.L. would be living there also.

C.P. testified that she lived with her parents on and off but was in CPS custody several times. She was last in CPS custody due to her behavior and described a fight with Mother "last year" when C.P. refused her medications and "went a little bit crazy." C.P. said she grabbed a pickax to try to hurt Mother.

C.P. attributed her siblings' removal to "misunderstandings." C.P. provided conflicting testimony and first denied seeing her siblings sexually abused or anyone touch anybody inappropriately, including J.L. C.P. then testified she talked to her parents about J.L. touching her siblings, and before C.P. went into custody, they assured her "it would be handled." She understood much of the case was based on sexual abuse and confirmed she and her older sister were victims of sexual abuse.

The initial charges filed against C.P. when she went into CPS custody were resolved, but she had additional charges filed since coming into CPS custody that were pending. She had many different placements, which she attributed to acting out because she wanted to go home. C.P. admitted to fighting, running away, taking pills, and doing drugs.

C.P. testified that on one occasion after running away, she was communicating with sex traffickers but denied speaking to them recently. C.P. also confirmed she chose to communicate with the traffickers and testified that a pimp

4

recently contacted her through social media. C.P. also testified regarding her "many" psychiatric hospitalizations and that she was not currently taking medications.

C.P. testified that her Aunt V would be a good person to consider for her siblings if their parents were not an option. She did not want CPS to leave without helping her parents find services, because she felt they needed assistance.[3]

Father's Testimony

Father testified that B.P., T.P., and C.P. are his children with Mother, and Mother had two older children, Mitch and J.L. Father testified the four older children were removed before B.P.'s birth but ultimately returned. Father denied witnessing or having knowledge of Mother's cocaine use. Father admitted he began using marijuana in 1974 while in the military but denied ever using cocaine and could not explain his August 2021 positive drug test result for cocaine. Father remembered the caseworker discussed services with him and testified he completed "many services."

Father testified that he did not believe the children sexually abused each other. He said Mother put locks on the children's doors. Father testified the pending sexual abuse charges against T.P. were "all false." He said he knew that T.P. never did

---

[3]At the conclusion of C.P.'s testimony, there was a lengthy bench discussion about C.P. being sex trafficked for three days while in CPS custody but also running away from home after she was returned and being sex trafficked again for eight days while she was gone. The trial court determined that C.P. had to be returned home to her parents, because she was sex trafficked while in State custody; the judge concluded that C.P.'s return would be monitored and severed her case.

anything to B.P., but Mother told police T.P. did. Father did not believe B.P. would be unsafe around T.P. or that J.L. touched T.P. Father was unconcerned with J.L. staying in the home if T.P. returned. Father confirmed that J.L. was living with them, but they arranged the morning of trial for her to live with his sister, Aunt V.

Father had never been to court with T.P. for the criminal charges and did not know the terms of T.P.'s probation or whether T.P. sees a counselor. He said nobody provided that information but admitted he had not asked about it.

Father confirmed he was arrested multiple times for family violence and as recently as 2020 but claimed the charges were dismissed. Father acknowledged he and Mother fought often but said that "stopped about three years ago" and denied the kids suffered from the effects of family violence.

Father testified C.P. has had problems with disobedience but did not see her assault Mother. He said C.P. came home from CPS for one day, then "she just took off." When asked about his plan to keep B.P. and T.P. safe if they returned home, he said J.L. would live with his sister, and C.P. never had a problem with the two younger children. When asked what he planned to do differently, Father responded,

> When they removed, I was at home with them watching TV. When they come back home, I plan to continue watching TV. What I plan to do different is to make sure this don't happen again. They was taken from me for no reason. They never touched themselves. They never touched each other.

6

He did not believe B.P. would be unsafe around T.P. Father testified he could provide B.P. and T.P. with a safe, stable environment.

Mother's Testimony

Mother testified CPS became involved with their family in 2007 when C.P. tested positive for marijuana at birth. Mother testified she stopped using marijuana then, because she wanted her children back from CPS custody. Mother also admitted she used alcohol and cocaine but said the last time she used cocaine was 12 or 13 years ago. She did not recall whether CPS removed the children in 2011 and said she was in the hospital for a medical and mental issue. Mother testified she only went to two drug tests because that was all the caseworker told her she needed; however, Mother later testified she could not recall how many times the caseworker asked her to test and that she did not submit to all requested drug testing.

Mother has been diagnosed with depression, bipolar disorder, and insomnia, and she takes medication. Mother testified she has gone off her meds "a few times." She sees a psychiatrist regularly, and they give her three months of prescriptions every time. When asked why she had missed some court hearings, Mother said she had COVID and "health issues" she did not wish to explain.

Mother said she did not remember when the police came to her home in June 2020 regarding allegations her children had been sexually abused, because she "was in the hospital having surgery." Mother denied telling police that T.P. sexually

7

abused B.P.; however, she acknowledged to police having a suspicion but never caught them. Mother denied that B.P. ever told her that her siblings sexually abused or molested her. According to Mother, the neighbor called police and reported they overhead Mother say the kids were touching each other, so Mother "went along with the call" but never said she saw anything happen. Mother denied calling 911 herself that day. Mother said she tried to determine what was going on, and they all "had issues[,]" so she separated them all and "was asking for help." She denied describing to police how T.P. assaulted B.P. and testified that B.P. slept in the bed with her.

Mother testified that police asked her to take B.P. for a SANE exam that night, but she declined because her other children were asleep and denied telling police she was too tired to take B.P. She said she took B.P. the next day. She denied her children were ever sexually abused and did not believe any sexual abuse occurred in her home.

Mother did not know what juvenile charges T.P. faced and denied he was arrested at her home. Mother could not recall the first time B.P. was placed in foster care, but it had been years.

Mother denied she ever used the locks on the children's doors but said she put them there as a precaution, because all the kids had depression. Mother explained when they returned from care, she was "being cautious" and had to relearn their behaviors. Mother testified that she contacted the Department to get them help.

8

Mother complained that during visits, she noticed B.P.'s hair was uncombed, and she re-wore clothes. She also complained that while in care, T.P. had a broken ankle, cut on his head, and a rash. Mother testified that when asked, she provided things for B.P. and T.P. while they have been in care.

Mother agreed C.P. had many needs. Mother testified that C.P. was involved in sex trafficking while in CPS care but denied it also occurred when C.P. returned home. Mother agreed C.P. ran away from her home and was gone several days but claimed she did not know she was sex trafficked.

Mother testified she was arrested for assaulting Father once, and Father had been arrested for assaulting her. Mother said they had an argument when she was drinking, and she "was out of control." She did not recall if she pled guilty to an assault by threat case in May 2021, because she was on and off her meds but agreed she pled guilty to some offense.

Mother did not believe there were safety concerns when the children were removed. Mother said she would protect the children and explained her plans if the children are returned, which included getting cameras and an alarm system to prevent C.P. from running away. Mother testified there were no issues preventing her from caring for T.P., B.P. or C.P., or meeting their needs. When asked how she would monitor the children while dealing with C.P., Mother testified that "is my challenge with my children."

9

She did not know where T.P. or B.P. went to school, did not know how T.P. was doing in school or if he would have to repeat a grade and had not asked the caseworker how he is doing. Mother testified the children were close and believed it was in their best interest to come home.

Rosalind McCray's Testimony

Rosalind McCray, the assigned CPS caseworker, also testified. McCray confirmed the case began with only C.P. in May 2020. In October 2020, the trial court appointed the Department temporary managing conservator of B.P., T.P., and J.L.

McCray testified Mother told her J.L. sexually abused T.P. and C.P. At the time, Mother did not acknowledge B.P. was also a victim of sexual abuse but later did and told McCray that T.P. was fondling B.P. McCray testified Mother never denied her children were victims, but Father never believed the sexual abuse happened despite their discussions of T.P.'s criminal charges.

McCray explained that for T.P. they "meet monthly with the probation officer, but it was not a[n] official charge. It's supervision." She said T.P. has matters pending that require regular meetings with the juvenile probation department, and he must meet with a licensed sex offender therapist weekly. As a condition of T.P.'s juvenile terms, he cannot be unsupervised around any minors. McCray did not have an end date for T.P.'s treatment.

10

McCray is concerned for B.P. and T.P.'s safety in the parents' home. Since the children repeatedly acted out sexually with each other, she is concerned about who is supervising them and whether they will be supervised. If T.P. returns to his parents, she feared for his stability, welfare, and that the cycle would repeat. McCray is concerned about T.P.'s criminal cases given his difficulty opening up, and he has shared conflicting information with different individuals. McCray testified she worried about B.P. and T.P. returning to a home where C.P. or J.L. reside. McCray questioned the children's safety given their reports of abuse by a sibling during forensic and SANE exams. McCray was also concerned the parents failed to protect the children from that abuse.

McCray expressed further concerns about the parents' domestic violence and Mother's mental health treatment. McCray said Mother reported she had been off her medication. McCray testified that when Mother is not medicated, she texts McCray beginning at 6 a.m. up to twenty times with profanity. According to McCray, Father expressed concerns about Mother's drinking and described Mother as "crazy."

McCray testified she spoke with the parents about the locks on the doors, but when she visited, the locks were not there. According to McCray, the parents told her the locks were to ensure the children stayed in their own rooms and were not

11

going into someone else's room while the parents slept. Both parents indicated they locked the doors with the children in the rooms.

McCray described Father's failure to engage with the children and his drug tests. Father told her he had not used drugs in years and did not know how he tested positive. McCray scheduled court ordered drug testing for both parents in February and received Father's results but not Mother's. McCray testified that she asked Mother to drug test at least once monthly, but Mother never submitted to testing.

McCray testified that the parents regularly brought food, clothing, and money for T.P.'s caregiver to visits. McCray observed Mother's visits with T.P. that she felt were inappropriate. She explained that Mother dressed inappropriately without wearing a bra and they discussed how certain types of touches could stimulate young men given T.P.'s history of sexual aggression, and after that, Mother complied "sometime." McCray testified that T.P.'s skin rash existed when he came into care, and they always addressed his skin condition medically when they see a problem.

McCray testified that she had been in the parents' home, and the home itself was appropriate for B.P. and T.P. She is concerned about both parents being unemployed, but they have been able to meet T.P.'s needs.

The Department has looked at other relatives and possible placements for the children, and their goal is adoption for B.P. and T.P. For T.P., they intend to pursue adoption with Aunt V, and McCray has been speaking with her. No relatives are

willing to take the children without terminating the parents' rights. McCray testified that T.P. had not experienced repeated harm while in the Department's care. Aunt V wants to adopt T.P., but they have not done a home study on Aunt V yet. She had no concerns when she observed T.P.'s visits with Aunt V, and they appear to have a "really close relationship[.]" McCray did not have concerns about T.P.'s future stability or welfare if he were adopted. B.P.'s current foster home is not an adoptive home, but a family familiar with her is interested in adoption, which the Department planned to pursue.

Based on prior conversations with the parents, McCray doubted the truthfulness of their testimony. McCray has no evidence the parents can provide the children with a safe home or have the necessary parenting skills to provide them with safety and testified that termination of parental rights was in the children's best interest.

Lucille Saah's Testimony

While working with the Montgomery County Sheriff's Department in June of 2020, Lucille Saah responded to a request for assistance. It originally came through as a child discipline call but changed to a sexual assault call. The call came through 911, and Mother made multiple 911 calls that night. When Saah arrived, her partner was outside talking to T.P., so she went inside to talk to Mother. Mother told her that T.P. was sexually assaulting her youngest daughter, B.P. Saah said Mother "was

13

adamant" the sexual abuse occurred. Mother said that B.P. slept in the bed with her, and T.P. had a bed on the floor in the same room. Mother told her she knew of the abuse, because B.P. was walking strange and kept going to the bathroom on herself. Mother told Saah about sexually explicit photos and search history on T.P.'s phone, which Mother felt caused him to assault B.P.

Saah testified that Mother reported the assaults occurred in the bedroom and described how they occurred. At the end of their investigation, they filed charges against T.P. for sexually assaulting B.P. Mother told Saah she had already contacted CPS about the situation, but when Saah contacted the caseworker to confirm this, they had no recollection.

When she asked Mother why she waited a month to report the sexual assault, Mother responded she did not believe it at first, then she tried to contact family members and CPS before she called the police. Saah advised Mother to take B.P. for a SANE exam that night, but Mother said she was too tired to take her. Mother told her she was familiar with SANE exams because her other children had them before. When Saah asked about collecting evidence like B.P.'s clothes and bedsheet, Mother changed her story about how the assaults occurred.

Mother told Saah that she was bipolar and schizophrenic and had not taken her medications in a while. Mother also mentioned Father hit her in the past but did not provide details.

<u>Jim Funke's Testimony</u>

Jim Funke, B.P.'s CASA advocate, also testified. He was assigned to the case in November or December 2020 and met with B.P. monthly. Funke also visited with the parents over the past year and expressed concern that Father appeared disengaged with B.P. and did not interact with her during visits. Funke testified Father never asked about B.P.'s education or how he could help her. Funke worried about ongoing drug use and sexual abuse against B.P. Funke believed that B.P. has seen a therapist, but he has not spoken with the therapist.

Funke expressed concern that J.L. lives with her parents, there was a risk of J.L. sexually abusing B.P., and the parents would not intervene. Funke testified that during one visit, J.L. called Father, and Father asked if B.P. wanted to talk to her, which concerned him for B.P.'s safety. Funke questioned Mother's ability to care for B.P., because he has not observed any changes in the conditions that existed prior to them coming into care. Mother's and Father's continued denials of what transpires in their home troubled him, and he believed it put B.P. and other children in their home at risk. He did not see the parents acknowledge their role in how the children came into CPS care. Their repeated denials concerned him, and he believed that it would put B.P. and other children in the home at risk.

Funke noticed personality changes in Mother when she called and described her "rants" about being a victim. Funke observed several visits between Mother and

B.P., which were appropriate. He said she asked in "general ways" what she could do to get her kids back, and Funke told her to contact CPS, since they administered those things. He believed CPS went above and beyond to reunite the family.

B.P. is placed with a foster family and doing great, but the foster family is not interested in adoption. Funke was not aware that B.P. had any special needs and described her as "a happy 6-year-old in a very good environment." He said she was comfortable, and her needs are being met in her current placement.

Funke testified another family that provided respite care for B.P. would be a good adoptive candidate, but he had not discussed the adoption option with them or made inquiries regarding their interest in adopting B.P. Funke met the family providing respite care and observed B.P. respond to them affectionately. Funke agreed with CPS's recommendation to terminate both parents' rights and believed termination was in B.P.'s best interest.

Ron Finch's Testimony

Ron Finch, T.P.'s CASA advocate, also testified. He was assigned the case in November 2020 and met with T.P. monthly for about a year. Finch also attended some monthly meetings with T.P.'s probation officer. In addition to the sexual abuse provider therapist, T.P. also receives treatment from a skills therapist.

Finch explained Mother used the natural bond between "mother and child to manipulate [T.P.]" Specifically, "she solicits statements of devotion from him

16

excessively and also she solicits sympathy for herself and it doesn't seem like a parent-child relationship but like a child-child relationship."

Finch said he did not have many conversations with the parents, usually during visits, and he visited their home but did not speak to them about services. Finch was not concerned about the home but feared T.P. was "emotionally vulnerable at his age" and given the strong bond with his parents, "he is vulnerable to being manipulated because of that bond."

Finch confirmed T.P. has educational issues, and he has spoken with T.P.'s therapist but has not shared the information from the therapist with the parents. The parents did not ask Finch about T.P.'s criminal case or education.

Finch has contacted Aunt V and said she seems like a loving aunt who is concerned about all the children, particularly T.P.; she seems committed to him and the adoption process. Finch believed that it would be appropriate for T.P. to live with Aunt V permanently and felt she could care for T.P.

Finch believed if T.P. returned to his parents, it would significantly impact his physical health or emotional welfare. Finch believed it was in T.P.'s best interest to terminate the parental rights of both parents.

Other Evidence

Additional evidence admitted at trial included photographs of the children, photographs of the inside of the parents' home, a copy of a family violence protective

order as to Father, a criminal complaint regarding Father violating that protective order, status hearing order requiring compliance with the service plan, a redacted copy of the service plan, and the parents' drug test results showing Father's positive results for cocaine and marijuana while the case was pending.

Termination

The trial court found by clear and convincing evidence the Department proved predicate termination grounds D, E, and O against Mother and Father as to B.P. and T.P. and that termination was in both children's best interest. The trial court appointed the Department as permanent managing conservator.

**Standard of Review**

The standard of proof required in cases involving termination of parental rights is clear and convincing evidence. *See* Tex. Fam. Code Ann. § 161.001(b); *In re E.N.C.*, 384 S.W.3d 796, 802 (Tex. 2012) (citing *In re J.F.C.*, 96 S.W.3d 256, 263 (Tex. 2002)) (other citations omitted). Clear and convincing evidence is "the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established. Tex. Fam. Code Ann. § 101.007.

When conducting a legal sufficiency review of the termination of parental rights,

a court should look at all the evidence in the light most favorable to the finding to determine whether a reasonable trier of fact could have formed a firm belief or conviction that the finding was true. To give appropriate deference to the factfinder's conclusions and the role of a court conducting a legal sufficiency review, looking at the evidence in the light most favorable to the judgment means that a reviewing court must assume that the factfinder resolved disputed facts in favor of its finding if a reasonable factfinder could do so. A corollary to this requirement is that a court should disregard all evidence that a reasonable factfinder could have disbelieved or found to have been incredible.

*In re J.F.C.*, 96 S.W.3d at 266; *see also In re E.N.C.*, 384 S.W.3d at 802.

In a factual sufficiency review, we "give due consideration to evidence that the factfinder could reasonably have found to be clear and convincing" and must determine "'whether the evidence is such that a factfinder could reasonably form a firm belief or conviction about the truth of the State's allegations.'" *In re J.F.C.*, 96 S.W.3d at 266 (quoting *In re C.H.*, 89 S.W.3d 17, 25 (Tex. 2002)). Considering the entire record, if the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction, then the evidence is factually insufficient. *Id.* We defer to the factfinder's findings and do not substitute our judgment for the factfinder's. *In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006). The factfinder is the sole arbiter of the witnesses' credibility and demeanor. *See id.* at 109 (quoting *In re J.L.*, 163 S.W.3d 79, 86–87 (Tex. 2005)).

Only one predicate finding under section 161.001(b)(1) is necessary to support a judgment of termination when there is also a finding that termination is in the child's best interests. *See In re A.V.*, 113 S.W.3d 355, 362 (Tex. 2003) (applying previous version of the statute). Since Mother challenges the endangerment findings and given the potential future consequences of a D or E finding for a parent to a different child, due process concerns and the requirement for a meaningful appeal mandate an analysis of these grounds. *See In re N.G.*, 577 S.W.3d 230, 236–37 (Tex. 2019) (per curiam); *In re C.M.C.*, 554 S.W.3d 164, 171 (Tex. App.—Beaumont 2018, no pet.); *see also* Tex. Fam. Code Ann. § 161.001(b)(1)(M) (providing a sufficient basis to terminate parental rights based on a previous section 161.001(b)(1)(D) or (E) finding).

**Analysis**

Mother's Challenge of Endangerment Findings: Statutory Grounds D and E

In her first two issues Mother challenges the sufficiency of the evidence supporting the trial court's endangerment findings, so we first consider whether the evidence is sufficient to support the findings terminating Mother's rights under subsections 161.001(b)(1)(D) and (E). *See In re N.G.*, 577 S.W.3d at 235–36. If the evidence is sufficient as to one of these grounds plus sufficient evidence exists to support the best interest finding, we will affirm the termination order. *See id.* at 232–33. ~~Because~~ Since evidence of grounds D and E is often interrelated, we consolidate

20

our review of these grounds. *See In re J.L.V.*, No. 09-19-00316-CV, 2020 WL 1161098, at *10 (Tex. App.—Beaumont Mar. 11, 2020, pet. denied) (mem. op.).

Subsection D allows for the termination of parental rights if clear and convincing evidence supports that the parent "knowingly placed or knowingly allowed the child to remain in conditions or surroundings which endanger the physical or emotional well-being of the child[.]" Tex. Fam. Code Ann. § 161.001(b)(1)(D). Under subsection E, parental rights may be terminated if clear and convincing evidence establishes the parent "engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangers the physical or emotional well-being of the child[.]" *Id.* § 161.001(b)(1)(E). The Texas Supreme Court has explained that "'endanger' means to expose to loss or injury; to jeopardize." *Tex. Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987) (citation omitted). To endanger a child, "it is not necessary that the conduct be directed at the child or that the child actually suffers injury." *Id.*

"Subsection D requires the endangerment to the child to be a direct result of the child's environment." *See Interest of J.H.*, No. 09-20-00056-CV, 2020 WL 4516860, at *10 (Tex. App.—Beaumont Aug. 6, 2020, no pet.) (mem. op.) (citation omitted). "Endangerment under subsection (D) arises from a child's environment and a parent's disregard for the potential for danger created by the environment." *Interest of I.V.H.*, No. 01-19-00281-CV, 2019 WL 4677363, at *5

21

(Tex. App.—Houston [1st Dist.] Sept. 26, 2019, pet. denied) (mem. op.) (citation omitted). We consider the child's environment before the Department obtained custody in our subsection D endangerment analysis. *See Interest of J.L.V.*, 2020 WL 1161098, at *10. Under subsection D, termination may be based on a parent's single act or omission. *In re A.B.*, 125 S.W.3d 769, 776 (Tex. App.—Texarkana 2003, pet. denied). It is unnecessary that a parent know with certainty the child is in an endangering environment; instead, awareness of the potential for danger and disregarding the risk is enough to show endangering conduct. *See In re J.H.*, 2020 WL 4516860, at *10.

To terminate a parent's rights under subsection E, the evidence must "show a conscious course of conduct." *In re C.M.C.*, 554 S.W.3d at 172 (citing *In re J.T.G.*, 121 S.W.3d 117, 125 (Tex. App.—Fort Worth 2003, no pet.)). In our analysis of subsection E, we may consider actions occurring before and after a child's birth to establish a "course of conduct." *See id.* (citation omitted).

Evidence of a parent's drug use can support the conclusion that the child's surroundings endanger her physical or emotional well-being under subsection D and qualify as a "voluntary, deliberate, and conscious course of conduct endangering the child's well-being under subsection (E)." *In re C.V.L.*, 591 S.W.3d 734, 751 (Tex. App.—Dallas 2019, pet. denied) (citation omitted). A parent's continued drug use after the child's removal is conduct that risks parental rights and may support an

endangering course of conduct under E. *See Cervantes-Peterson v. Tex. Dep't of Family & Protective Servs.*, 221 S.W.3d 244, 253 (Tex. App.—Houston [1st Dist.] 2006, no pet.) (noting that mother's continued narcotics use after child's removal in the face of drug testing, jeopardized her relationship with her child). The family had a lengthy CPS history going back many years, and the children had been removed repeatedly, beginning when C.P. tested positive for marijuana at birth. Mother refused to submit to drug testing during this case's pendency, despite the service plan's requirement for random drug testing and the caseworker's monthly requests. The trial court may infer from these refusals that Mother was using drugs. *See In re K.C.B.*, 280 S.W.3d 888, 895 (Tex. App.—Amarillo 2009, pet. denied) (noting trial court may infer from parent's refusal to submit to drug test that they are using drugs).

"Domestic violence and a propensity for violence may be considered evidence of endangerment, even if the endangering acts did not occur in the child's presence, were not directed at the child, or did not cause actual injury to the child." *In re K.A.R.*, No. 04–17–00723–CV, 2018 WL 1733147, at *3 (Tex. App.—San Antonio Apr. 11, 2018, pet. denied) (mem. op.); *see Boyd*, 727 S.W.2d at 533. Abusive or violent conduct by a parent or other resident of a child's home can produce an environment endangering the child's physical or emotional well-being. *In re K.A.S.*, 131 S.W.3d 215, 222 (Tex. App.—Fort Worth 2004, pet. denied). Both parents admitted during trial to a history of domestic violence, and both had been arrested for it.

23

Documentary evidence showed that Father violated a domestic violence protective order. The trial court also heard evidence of C.P.'s violent outburst in the home. The trial court could have reasonably concluded the history of domestic violence in the home endangered the children. *See id.*

Mental illness alone is not a ground for terminating the parent-child relationship, but untreated mental illness can expose a child to endangerment and is a factor the court may consider. *In re S.R.*, 452 S.W.3d 351, 363 (Tex. App.—Houston [14th Dist.] 2014, pet. denied). Despite multiple mental illness diagnoses and regularly seeing a psychiatrist, Mother failed to consistently take her medication. The caseworker observed significant changes in Mother's behavior when she did not take her medications like sending multiple profane text messages to the caseworker. Under these facts, the trial court could have concluded Mother's failure to comply with mental health treatment exposed her children to endangerment. *See id.*

"Sexual abuse is conduct that endangers a child's physical or emotional well-being." *In re E.A.G.*, 373 S.W.3d 129, 143 (Tex. App.—San Antonio 2012, pet. denied) (citations omitted). Sexual assault of a child in the home is conduct the court can infer will endanger the physical and emotional well-being of other children in the home who may either discover the abuse or be abused themselves. *Id.* Evidence established that J.L. and T.P. sexually abused their siblings. *See In re R.W.*, 129 S.W.3d 732, 742 (Tex. App.—Fort Worth 2004, pet. denied) (noting evidence of one

24

child's sexual abuse is sufficient to support an endangerment finding as to other children). Despite Mother denying this at trial, multiple witnesses testified that Mother admitted this abuse occurred in her home, and she waited a month to report the abuse to authorities. The evidence showed neither parent was protective of the children when it came to the sexual abuse. Both CASA advocates and the caseworker testified they had concerns about B.P. and T.P. returning to their parents' home and feared the cycle of abuse would continue. C.P. confirmed both she and a sibling had been sexually abused. She also testified regarding J.L. touching her siblings and that her parents assured her it would be "handled."

The evidence of the parents' drug use, domestic violence, and sexual abuse was sufficient for the trial court to conclude that Mother had exposed B.P. and T.P. to risk of loss or injury. *See Boyd*, 727 S.W.2d at 533. Viewing the evidence in the light most favorable to the trial court's findings, we conclude that the factfinder could reasonably have formed a firm belief or conviction that Mother (1) knowingly placed or knowingly allowed the children to remain in conditions or surroundings which endangered their physical or emotional well-being and (2) engaged in conduct or knowingly placed the children with persons who engaged in conduct that endangered the children's physical or emotional well-being. *See* Tex. Fam. Code Ann. § 161.001(b)(1)(D), (E); *see also In re J.F.C.*, 96 S.W.3d at 266; *In re J.T.G.*, 121 S.W.3d at 125. Further, considering the entire record, we conclude the disputed

25

evidence is not so significant as to prevent the trial court from forming a firm belief or conviction that termination of Mother's parental rights was warranted under subsection D and E. *See In re J.F.C.*, 96 S.W.3d at 266.

We overrule Mother's first and second issues and decline to address her third and fourth issues. *See In re J.S.*, No. 09-20-00294-CV, 2021 WL 2371244, at *9–10 (Tex. App.—Beaumont June 10, 2021, no pet.) (mem. op.) (noting if there are multiple predicate grounds, we will affirm based on any one ground as only one is necessary to terminate parental rights); *see also* Tex. R. App. P. 47.1 (requiring appellate courts to issue a written opinion as brief as practicable that addresses all issues necessary to the appeal's disposition).

Best Interest

Both parents challenge the legal and factual sufficiency of the evidence supporting the trial court's best interest finding. Trial courts have wide latitude in determining the children's best interest. *See Gillespie v. Gillespie*, 644 S.W.2d 449, 451 (Tex. 1982). There is a strong presumption that the children's best interest is served by keeping them with their parent. *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006) (citing Tex. Fam. Code Ann. § 153.151); *In re D.R.A.*, 374 S.W.3d 528, 533 (Tex. App.—Houston [14th Dist.] 2012, no pet.); *see also* Tex. Fam. Code Ann. § 153.131(b). Prompt and permanent placement of the child in a safe environment is also presumed to be in the child's best interest. Tex. Fam. Code Ann. § 263.307(a).

26

The parents contend the Department's evidence fails to address all the *Holley* factors. The Family Code outlines factors to be considered in determining whether a parent is willing and able to provide a safe environment for the children. *See id.* § 263.307(b). Several other nonexclusive factors may be considered a best interest analysis, including: (1) the desires of the children; (2) the emotional and physical needs of the children now and in the future; (3) the emotional and physical danger to the children now and in the future; (4) the parental abilities of the individuals seeking custody; (5) the programs available to assist these individuals to promote the best interest of the children; (6) the plans for the children by these individuals or by the agency seeking custody; (7) the stability of the home or proposed placement; (8) the parent's acts or omissions that may indicate that the existing parent-child relationship is not a proper one; and (9) any excuse for the parent's acts or omissions. *See Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976); *see also In re A.C.*, 560 S.W.3d 624, 631 (Tex. 2018) (characterizing the *Holley* factors as "nonexclusive"). No particular *Holley* factor is controlling, and evidence of one factor may be enough to support a finding that termination is in the children's best interest. *See M.C. v. Tex. Dep't of Family & Protective Servs.*, 300 S.W.3d 305, 311 (Tex. App.—El Paso 2009, pet. denied) ("Undisputed evidence of just one factor may be sufficient to support a finding that termination is in the best interest of a child.") (citations omitted); *see also In re C.H.*, 89 S.W.3d at 27.

We may consider circumstantial evidence, subjective factors, and the totality of the evidence in our best interest analysis. *See In re N.R.T.*, 338 S.W.3d 667, 677 (Tex. App.—Amarillo 2011, no pet.). A parent's past conduct is relevant to determining the parent's present and future ability to care for a child. *See In re C.H.*, 89 S.W.3d at 28. Evidence supporting the statutory grounds for termination may also be used to support a finding that the best interest of the child warrants termination of the parent-child relationship. *See id.*

We have previously explained the trial evidence shows Father's history of drug use, domestic violence, and continued denials of the sexual abuse occurring between the children. Additionally, Father saw nothing wrong with the children returning to live in the same home with the siblings that sexually abused them. Father did not know the terms of T.P.'s probation, which prohibited him from being unsupervised with other minors. When asked what his plans were for dealing with B.P. and T.P. if they returned to his home, Father said the children were removed for no reason.

Likewise, the evidence showed Mother's inappropriate relationship with T.P., her refusal to submit to drug testing, her refusal to consistently take medication to control her mental illness, her domestic violence against Father, and that she waited

28

a month to report T.P. was sexually abusing B.P. The evidence also showed that C.P. was arrested and placed in CPS custody for threatening Mother with a pickax.[4]

While evidence of placement plans and adoption are relevant to best interest, the lack of evidence about definitive plans for permanent placement and adoption cannot be the dispositive factor. *In re C.H.*, 89 S.W.3d at 28. Otherwise, best interest determinations would regularly be subject to reversal on the sole basis that an adoptive family cannot yet be located. *Id.* Instead, we ask whether, on the entire record, a factfinder could reasonably form a firm conviction or belief that termination of the parent's rights is in the child's best interest—even if the agency is unable to identify with precision the child's future home environment. *See id.* Although permanent placements were not final for the children, the caseworker and CASA volunteers described potential adoptive options for B.P. and T.P. The testimony established that the children's needs were being met in their current placements, including ongoing therapy. The CASA volunteers and caseworker testified it was in B.P. and T.P.'s best interest for both parents' rights to be

---

[4]To the extent the parents argue that C.P.'s return to their home is proof that termination is not in the best interest of B.P. and T.P., we disagree. The evidence at trial established that C.P. struggled with severe behavioral issues, which made placing her difficult while in CPS care. The evidence further established that C.P. ran away while in CPS care and from her parents, which led her to being sex trafficked on both occasions. The testimony went to C.P.'s unique circumstances. The fact that she returned to her parents' home on a monitored basis did not mean it was in B.P. and T.P.'s best interest to do so.

terminated. Specifically, they were concerned about the pattern of abuse continuing and saw nothing that made them believe circumstances had changed in Mother's and Father's home.

Considering the evidence related to best interest, deferring to the trial court's determinations on witness credibility, the resolution of conflicts in the evidence, and the weight given to the testimony, we conclude that the statutory and *Holley* factors weigh in favor of the trial court's finding that termination is in the children's best interest. *See* Tex. Fam. Code Ann. §§ 161.001(b)(2), 263.307(a), (b); *Holley*, 544 S.W.2d at 371–72. The trial court could have reasonably formed a firm belief or conviction that termination of Mother's and Father's parental rights was in B.P.'s and T.P.'s best interest. *See In re C.H.*, 89 S.W.3d at 28; *In re S.Q.*, No. 13-01-156-CV, 2001 WL 1559232, at *4 (Tex. App.—Corpus Christi Dec. 6, 2001, no pet.) (mem. op.) (concluding termination was in children's best interest where evidence showed mother failed to supervise children, older siblings sexually abused younger sisters, and children had behavioral problems, among other things). We overrule Mother's fifth issue and Father's sole issue.

## Conclusion

Having overruled Mother's challenge to the legal and factual sufficiency of the evidence supporting predicate grounds D and E and both parents' challenge to the trial court's best interest finding, we affirm the trial court's termination order.

AFFIRMED.

_____
W. SCOTT GOLEMON
Chief Justice

Submitted on May 31, 2022
Opinion Delivered June 23, 2022

Before Golemon, C.J., Horton, and Johnson, JJ.